## CREEK NATION *v.* UNITED STATES.*

No. 321.  Argued January 6, 7, 1943.—Decided April 5, 1943.

*Together with No. 322, *Seminole Nation* v. *United States,* also on writ of certiorari, 317 U. S. 614, to the Court of Claims.

*Mr. Paul M. Niebell,* with whom *Messrs. C. Maurice Weidemeyer* and *W. W. Pryor* were on the brief, for petitioners.

*Mr. Archibald Cox,* with whom *Solicitor General Fahy, Assistant Attorney General Littell,* and *Messrs. Vernon L. Wilkinson* and *Dwight D. Doty* were on the brief, for the United States.

MR. JUSTICE BLACK delivered the opinion of the Court.

These actions were originally brought in 1926 under special jurisdictional acts of 1924, which gave the Court of Claims jurisdiction over claims under "any treaty or agreement between the United States" and these tribes.[1]

---

[1] 43 Stat. 133, 43 Stat. 139. See also the jurisdictional act of 1937, 50 Stat. 650.

The actions were based on a contention that the United States had breached its obligation as a guardian of its Indian wards in failing to collect the sums described below. The Court of Claims sustained a demurrer to the first complaint, on the ground that the special jurisdictional acts permitted actions brought on specific statutory or treaty pledges only, and not actions brought on a wardship theory. 75 Ct. Cls. 873. The petitioners subsequently amended their complaints to comply with the requirements of the jurisdictional acts, alleging that the United States in specific statutes and treaties guaranteed to repay the Indians for the losses claimed to have been suffered. The Court of Claims sustained a demurrer to the second amended complaint on the ground that it did not state a cause of action, 97 Ct. Cls. 591, and we granted certiorari because of the importance of the questions raised in the administration of Indian affairs. The cases present the question whether the United States has assumed treaty or statutory obligations which require it to indemnify the Creek and Seminole nations for injuries alleged to have been suffered by them as a result of the seizure and use of their land by private railroad companies.

By the treaties of 1866,[2] the Creeks and Seminoles granted a right of way to railroads which the United States might later authorize to construct and operate routes across their lands. They agreed to permit the railroads to buy strips up to three miles in width on each side of the track. In the succeeding thirty-six years, Congress, by a series of special acts, authorized the construction and operation of railroads,[3] and in 1902 it passed a

---

[2] 14 Stat. 755 (Seminole), 785 (Creeks). The treaties are sufficiently similar so that hereafter reference will be made to the Creek treaty only.

[3] The treaty was originally interpreted as permitting the construction of only two railroads through the Territory. Letter of the Secre-

general statute concerning future railroad construction in the Indian Territory.[4] The 1902 Act included a provision, § 16, that railroads should pay a fixed annual sum per mile to the Secretary of the Interior for the benefit of the tribes.

The Indians allege that the railroads have not complied with the terms of the treaties and statutes, in that they have taken and held certain station reservations unnecessary for railroad purposes for their own benefit, that they have received rents and profits from the use of these lands, and that they have failed to pay the annual mileage charge.[5] They ask that the government indemnify them for the value of the lands allegedly wrongfully taken, for rents and profits accruing to the railroads from their use of those lands, and for the mileage charge.

It must be emphasized that this action is brought, not against the railroads which have committed the asserted

tary of the Interior to the President, May 21, 1870, approved by him May 23, 1870, referred to at 13 O. A. G. 285 (1870). In the 1880's, Congress began, in a series of special acts, to authorize construction of railroads through the Indian Territory on a theory of eminent domain. *Cherokee Nation* v. *Southern Kansas Ry. Co.*, 135 U. S. 641. See e. g. the Committee Report and discussion of the bill granting a right of way to the Gulf, Colorado & Santa Fe Railway, 15 Cong. Rec. 4711 *et seq.* (1884). Approximately one half of the railroads involved in the instant case appear to have been authorized by special acts and to have been constructed prior to the general act of 1902. For a general history of railroads in Oklahoma, see Bulletin No. 60, The Railway and Locomotive Historical Society, "The Railroads of Oklahoma," published through the Baker Library of the Harvard Business School (1943).

[4] An Act regulating general construction of railroads through Indian lands was first adopted in 1899, 30 Stat. 990. The 1902 Act was more particularly directed at construction through the territory of the Five Civilized Tribes, of which petitioners are two.

[5] Under an opinion of the Secretary of the Interior, the obligation to make this payment terminated upon the admission of Oklahoma as a state in 1907. 38 Decisions of Secretary of the Interior (Public Lands) 414.

misdeeds, but against the government for its failure to collect the sums claimed for the petitioners from the railroads. The question for decision here, therefore, is whether, assuming arguendo that the railroads are at fault, the government was obligated to compel restitution or to recover damages; and if the government failed to do these things, whether it had a duty to make the Indians whole. We are asked to. find an agreement to indemnify the tribes for these losses in the Treaty of 1866, the Act of 1902, and an Act of 1906.

*First.* The Treaty of 1866. Article I of the Treaty provided:

"[The Creeks] also agree to remain at peace with all other Indian tribes; and, in return, *the United States guarantees them quiet possession of their country,* and protection against hostilities on the part of other tribes. In the event of hostilities, the United States agree that the tribe commencing and prosecuting the same, shall, as far as may be practicable, make just reparation therefor." (Emphasis added.)

The petitioners contend that the government failed to prevent the railroads from taking and holding station reservations later found to be unnecessary for railroad purposes, and that it thus became liable to the petitioners for breach of the guarantee of "quiet possession."

The Court of Claims concluded that the guarantee of quiet possession applied only to protection from hostilities by other tribes. Such a conclusion receives support from a consideration of the circumstances of the time, for inter-tribal warfare was a dominant danger. Some of the tribes had fought on each side in the Civil War, and strange new tribes were about to be settled on adjacent land. The turmoil of reconstruction called for military protection.

We conclude that, whether or not the guarantee is limited to military protection, this language did not obli-

gate the United States to compensate the tribes for encroachments by railroads acting under color of right. Keeping the peace and protecting the Indians was a difficult, and at times almost impossible, task,[6] and we cannot assume that the government meant to guarantee reparations for breach of quiet possession without a single explicit word in the Treaty to that effect. Where reparations were planned, clear language was used. Thus, in the section quoted above, hostile tribes, and not the government, were explicitly made liable for the tribe's depredations. There is no such provision putting a similar liability for losses of any sort on the United States.[7] A promise by the government to try to keep the peace is not equivalent to a promise to make payments if the peace is not kept; "and before any judgment should be rendered binding the United States it is familiar and settled law that the statute claimed to justify such judgment should be clear and not open to debate." *Leighton* v. *United States,* 161 U. S. 291, 296, 297.

This conclusion does not mean that the United States in signing the treaty made an empty promise. The government undertook to use its military power to protect the Indians against military aggression, and in addition it un-

---

[6] "The treaties of 1866, and other treaties also, guarantee to the five civilized tribes the possession of their lands; but, without the moral and physical power which is represented by the Army of the United States, what are these treaties worth as a protection against the rapacious greed of the homeless people of the States who seek homesteads within the borders of the Indian Territory? If the protecting power of this Government were withdrawn for thirty days, where would the treaties be, and the laws of the Indians and the Indians themselves?" Report of the Commissioner of Indian Affairs in 1 Report, Secretary of the Interior (1886), 81.

[7] The only instance which has been called to our attention in which the United States specifically guaranteed to bring civil actions for the benefit of a tribe and insured payment for trespasses is the treaty of May 24, 1834, with the Chickasaws, 7 Stat. 450.

dertook through its administrative and legislative policy to aid the tribes to hold possession of their lands.   In view of the pressures of the time, it appears to have treated its obligation with real care.   The acts providing for the construction of the railroads, for example, provided for payment to the Indians for the land taken,[8] attempted to restrict the amount granted to that necessary,[9] and usually provided for reversion of title to the Indians upon discontinuance of the road.[10]   In 1871, upon appeal of the tribes, the Secretary of the Interior refused to permit a road to enter the territory because of a claimed violation of the treaty.[11]   The guarantee of quiet possession called for a

---

[8] The Act of July 27, 1866, 14 Stat. 292, § 7, authorizing the construction of a railroad through the Indian country provided for a jury trial to determine the fair price.   See, for example of the liberal construction given a similar provision in 23 Stat. 73, *Cherokee Nation* v. *Southern Kansas Ry. Co.*, 135 U. S. 641, 651–653.   Another act passed in 1866, 14 Stat. 289, § 8, provided that the railroad should be constructed "with the consent of the Indians, and not otherwise."

[9] Note, for example, in the Congressional discussion of the bill authorizing construction of the Gulf, Colorado & Santa Fe Railway, an Oklahoma railroad not directly involved here, the debate over the amount of land necessary for sidings.   15 Cong. Rec. 4715–4718 (1884).

[10] The experience of one of the first of the two roads authorized under the treaty is revealing of the manner in which the use of the Indian lands was supervised: The Atlantic & Pacific Railroad was authorized to build a line by an 1866 Act, 14 Stat. 292.   In 1871, after small parts of the line had been completed, it was ordered to cease work by the Secretary of the Interior and was not allowed to continue until it had posted a bond for the protection of Indian interests.   See discussion in *Atlantic & Pacific R. Co.* v. *Mingus*, 165 U. S. 413, 417.   Failure to complete the road resulted in an 1886 Act taking the lands previously granted back into the public domain, 24 Stat. 123, and the road was ultimately completed by the St. Louis & Oklahoma City Ry. Co. under an 1896 special act, 29 Stat. 69.   Section 2 of that Act provides for reversion to the tribes of lands not used for railroad purposes.

[11] Letter, Secretary of the Interior, May 21, 1870, *supra*, note 3,

series of legislative, administrative, and military judgments, but was not a pledge of monetary reparation.

*Second.* The Act of February 28, 1902. The petitioners rest on §§ 15 and 16 of the Act of 1902. Section 15 provides that the tribes through whose land the roads were to be built should be compensated by the railroads for the land taken. The section established a system of valuation under judicial supervision and with a right of appellate review. These elaborate provisions provide an adequate method by which the tribes might protect their own interests, but contain no indication of any kind that the government should pay for the lands taken.[12]

Section 16 provides that "where a railroad is constructed under the provisions of this Act there shall be paid by the railroad company to the Secretary of the Interior, for the benefit of the particular tribe or nation through whose lands any such railroad may be constructed, an annual charge of fifteen dollars per mile. . . . " Petitioner contends that this direction to the Secretary to accept these payments made the government an insurer of their collection.

Variants of this statutory phrase were used generally in acts authorizing railroad construction after 1884. The Act of 1902, as has been noted, was the successor to the general railroad authorization act of 1899, which in 30 Stat. 990, § 5, required "such an annual charge as may be prescribed by the Secretary of the Interior, not less than fifteen dollars for each mile." Other acts of the period varied in that the Secretary was directed to apportion the sum collected among several tribes according to their interests.[13] Some of the earlier acts mentioned no specific sum, giving the Secretary complete discretion as to the

---

[12] Whether added obligations in connection with this section were assumed by the United States in the 1906 Act is considered below.

[13] See, e. g., the act authorizing construction of the Kansas & Arkansas Valley Railroad, 24 Stat. 73, § 5 (1886), or the act authoriz-

amount to be collected and the method of allocating it.[14] This device of assessment of an annual charge payable to the Secretary was also used in authorizing construction of telephone and telegraph lines across Indian lands, 25 U. S. C. § 319.

By the time of the adoption of the 1902 Act, the verbal formula used in § 16 was so familiar that it required no discussion in Congress. The clause seems first to have been used in an act of 1884, 23 Stat. 69, § 5, authorizing the Gulf, Colorado & Santa Fe Railway to cross the Indian territory. The $15.00 charge was considered a tax, approximately equal to the taxes charged by neighboring states.[15] No word was said indicating that the United States, acting as a voluntary tax collector for the tribes, meant to guarantee to the tribes that the taxpayers would make their payments when due.

Considering § 16 in its relation to the other statutes of the period, many of which through minor variations gave wide discretion to the Secretary of the Interior, we conclude that the words of this section were a direction to the Secretary to make the facilities of his office available for the payment of a form of tax. It provides that the railroads shall pay the tax to the Secretary, but puts no mandatory duty on the Secretary to do the work of collecting. We cannot suppose from any evidence before us either of legislative history or administrative practice that the United States repeatedly assumed obligations to in-

---

ing construction of a branch of the St. Louis & San Francisco Railroad, 29 Stat. 80, § 5 (1896).

[14] The act authorizing construction of a railroad through the Papago (Arizona) reservation provided: "Such compensation as may be fixed by the Secretary of the Interior be paid to him by the said railroad company, to be expended by him for the benefit of the said Indians." 22 Stat. 299 (1882).

[15] See discussion in the House of Representatives, 15 Cong. Rec. 4723–4727. For an analysis of the nature of this tax see the Opinion of the Secretary of the Interior, *supra,* note 5.

demnify the Indian tribes for charges which railroad companies, telephone companies, and telegraph companies constructing lines across Indian lands may have failed to pay. Cf. *United States* v. *Algoma Lumber Co.*, 305 U. S. 415, 421.

*Third.* The Act of 1906. Congress at one time planned to terminate the existence of the Five Civilized Tribes in 1906, and the Act of 1906 was introduced into the House of Representatives with the object of preserving Indian interests after tribal dissolution. In the course of discussion, Congress determined to continue the tribal existence, and the Act was amended to that effect before passage. The petitioners' final reliance is on §§ 11 and 18 of this Act.

The relevant portion of § 11 of the Act is as follows:

"All revenues of whatever character accruing to the . . . Creek and Seminole tribes, whether before or after dissolution of the tribal governments, shall . . . be collected by an officer appointed by the Secretary of the Interior under rules and regulations to be prescribed by him."

The petitioner contends that under this section the government is liable for rents and profits on the station reservations allegedly wrongfully taken and wrongfully used by the railroads.

This language, like that of § 16 of the 1902 Act which it so closely resembles, does not make the government a guarantor that sums owing will be paid. The claim asserted is in essence one of damages for trespass, and assuming that the proceeds of a trespass action are to be considered "revenue," the Secretary was surely entitled to discretion as to which trespass actions he might consider worth bringing. In so far as the petitioner contends that the railroads wrongfully took lands under pretense of right in their original grants under the statutes, the administrative machinery provided by the acts gave the tribes adequate redress through the courts at the time the land

was taken.[16]   As to trespasses which may have been committed by the railroads without compliance with the forms of the authorizing Acts, or as to holdings, once proper, which the railroads may have retained after the rights to them had expired, we find no absolute duty on the Secretary to obtain compensation.

That the Secretary's duty to collect revenues and institute actions under the Act was discretionary is made clear by § 18:

"The Secretary of the Interior is hereby authorized to bring suit in the name of the United States, for the use of the . . . Creek, or Seminole tribes, respectively . . . for the collection of any moneys or recovery of any land claimed by any of said tribes. . . ."

The petitioners contend that under this section the Secretary was obligated to bring suit for all damages suffered by the tribes for failure to pay sums owing under §§ 15 and 16 of the 1902 Act, for trespass and mileage taxes, for any breach of the treaty, and for rents and profits collected by the railroads.   But the use of the word "authorized" in this context necessarily reserved to the Secretary the right to determine his own course of action. It must be remembered that the Secretary was traditionally given wide discretion in the handling of Indian affairs [17] and that discretion would seldom be more necessary than in determining when to institute legal proceedings.   For example, a railroad might have become bankrupt or reorganized before a failure to make proper payments was discovered,[18] making recovery impossible; and

---

[16] See for example § 15 of the 1902 Act.

[17] Cohen, Handbook of Federal Indian Law, "The Range of Administrative Powers," 100 *et seq.*

[18] The Oklahoma properties of the St. Louis & San Francisco Railway Co. were held by 25 different corporations between 1866 and 1916.   The Atchison, Topeka & Santa Fe, not directly involved in this action, is the descendant of 64 railroads with Oklahoma holdings.

we can not suppose that the Secretary might not compromise difficult cases without bringing suit.

That the government did not mean to assume an insurer's responsibility for the payment of sums claimed by the Indians against the railroads is further shown by the fact that the Indians retained their own independent remedy for wrongs done them. The tribes have not yet been dissolved, and they have had, both as a general legal right [19] and by virtue of the very section of the 1906 Act under discussion here, the power to bring actions on their own behalf. That the United States also had a right to sue did not necessarily preclude the tribes from bringing their own actions.[20]

We are asked here to impose a liability on the government to these Indians for wrongs allegedly committed against the Indians by others. Appreciating the desire of Congress to recognize the "full obligation of this nation to protect the interests of a dependent people," *Tulee* v. *Washington*, 315 U. S. 681, 685, we are unable to find in the words of the treaties or statutes upon which this action rests any such prodigal assumption by the government of other people's liabilities as that for which the petitioners contend here.

*Affirmed.*

Mr. Justice Rutledge took no part in the consideration or decision of this case.

Approximately 150 railroads have existed in Oklahoma. See "The Railroads of Oklahoma," *supra*, note 3, pp. 28–77.

[19] *Cherokee Nation* v. *Southern Kansas Ry. Co.*, 135 U. S. 641; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553. Cf. *Lane* v. *Pueblo of Santa Rosa*, 249 U. S. 110, and *United States* v. *Candelaria*, 271 U. S. 432.

[20] Cf. *Heckman* v. *United States*, 224 U. S. 413, 446; *United States* v. *Osage County*, 251 U. S. 128; *Sunderland* v. *United States*, 266 U. S. 226.

Mr. Justice Murphy, dissenting:

As a people our dealings with the Indian tribes have been too often marked by injustice, neglect, and even ruthless disregard of their interests and necessities. As a nation we have incurred moral and political responsibilities toward them and their descendants, which have been requited in some measure by treaties and statutes framed for the protection and advancement of their interests. Those enactments should always be read in the light of this high and noble purpose, in a manner that will give full scope and effect to the humane and liberal policy that has been adopted by the Congress to rectify past wrongs.[1]

Each railway company whose road was constructed under the Act of 1902 [2] was required by § 16 of that Act to pay to the Secretary of the Interior, for the benefit of the particular tribe through whose lands the road passed, an annual charge of fifteen dollars for each mile of road constructed. By the Act of 1906 it was provided that all revenues accruing to the Five Civilized Tribes "shall . . . be collected by an officer appointed by the Secretary of the Interior," and the Secretary was authorized to bring suit in the name of the United States for the use of any one of the five tribes to collect any moneys claimed by it.[3] For failure of the Secretary of the Interior to collect these mileage charges for the Creek and Seminole tribes, among other things, this action is brought under jurisdictional acts [4] which authorize the Court of Claims to hear and

---

[1] *Choctaw Nation* v. *United States*, 119 U. S. 1, 27–28; *Seminole Nation* v. *United States*, 316 U. S. 286, 296–97.

[2] Act of February 28, 1902, 32 Stat. 43.

[3] §§ 11 and 18 of the Act of April 26, 1906, 34 Stat. 137, 141, 144.

[4] Act of May 20, 1924, 43 Stat. 133 (Seminole), and Act of May 24, 1924, 43 Stat. 139 (Creek).

determine all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and those tribes, or out of any act of Congress relating to Indian affairs.

We have held that the Government in its relations with the Indian tribes occupies the position of a fiduciary, that the relationship is similar to that of guardian and ward, and that the duties and responsibilities of the United States toward its wards require a generous interpretation.[5] If it is the duty of a guardian or trustee, as I conceive it to be, to exercise diligence to conserve and protect the interests of his trust, and collect moneys due to the estate of his ward, then such a duty may well have arisen under § 16 of the Act of 1902, a duty which, it is alleged, the Secretary of the Interior failed to discharge. In other words, if the railroads failed to pay to the Secretary the required annual charges for each mile of road constructed, it was the Secretary's duty to act to protect the Indian beneficiaries who should not be expected to assume the burden of acting on their own behalf, especially when the payments were to be made to the Secretary and not to them. Cf. *United States* v. *Creek Nation*, 295 U. S. 103, 110. To read the Act of 1902 otherwise is to take too restricted a view of the obligations of the United States toward a dependent people. But if there were any doubt, the duty of the Secretary of the Interior to collect the mileage charges was made plain and unmistakable by the Act of 1906, which required him to collect all revenues accruing to the tribes and specifically authorized him to bring suit on their behalf. The present claim to mileage charges undoubtedly is an equitable one arising out of those statutes and is therefore within the scope and purpose of the jurisdictional acts.

---

[5] See Note 1, *ante.*

In my opinion the petitioners state a cause of action with respect to these mileage claims, and the judgment of the Court of Claims should accordingly be reversed.

MR. JUSTICE FRANKFURTER agrees with these views.