E. L. ARMIGER ET AL. ESTATES
v.
The UNITED STATES.

Marjorie H. ALBRECHT, Gertrude and Donald Bein, Margaret K. Clark, Albert Desiderio, and Zebulon V. Young, Respectively, either as Personal Representative, Heir-at-Law, Next-of-Kin, and/or Next Friend, of William F. Albrecht, Henry Bein, Robert L. Clark, Albert J. Desiderio, and Jefferson B. Young, All Deceased
v.
The UNITED STATES.
Cong. No. 11–60.

United States Court of Claims.
Dec. 11, 1964.

Eugene Gressman, Washington, D. C., for plaintiffs. William Howard Payne and Arthur P. Scibelli, Washington, D. C., of counsel.

Arthur E. Fay, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge.

This Congressional reference[1] arises out of a plane crash in South America on February 25, 1960, which resulted in the deaths, while on an official tour, of nineteen members of the United States Navy Band. Plaintiffs represent the estates of these band members.[2] On behalf of each member, the suit seeks to recover $50,000, the amount of commercial insurance which allegedly would have been obtained but for the failure of Navy officials to supply insurance application forms prior to the flight. Pursuant to 28 U.S.C. §§ 1492 and 2509, the House of Representatives has referred H.R. 11905, 86th Cong., 2d Sess. (1960), a bill for plaintiffs' relief.

Since at least as early as 1952, it has been an established practice to provide Navy Band members with commercial flight insurance forms prior to any band trip by air. This responsibility was assumed by the drum major, who was head of the operations department of the band. Although the forms were distributed primarily for the convenience of the individual members, their distribution was also for the benefit of the band as an entity—to prevent airport delays resulting from last-minute attempts to secure insurance. The members had come to rely on this practice.

The only time such insurance forms were not provided for an official trip was prior to the flight during which the fatal accident occurred. The unusual circumstances surrounding the South American tour, of which this flight formed one leg, provide an explanation for the slip-up. Prior trips had been planned well in advance. This one, however, was first conceived on January 25, 1960, in connection with a February visit to South America arranged for President Eisenhower. A meeting was held on January 26 to apprise the bandsmen that a tour was tentatively being planned. On or about January 28, their commander informed them that the trip was definite, but was to be kept secret. Only a few details of the flight itinerary were made known. The bandsmen were not told of the flight on which the crash occurred, since it had not yet been scheduled.

Prior to their departure from Washington to Trinidad on February 6, 1960, many band members inquired about obtaining flight or life insurance for the South American tour. Chief Petty Officer Zetty, the drum major, who regularly took care of the matter, made two different forms of commercial insurance available several days prior to that initial flight. One was a much costlier comprehensive policy covering accidental injury or death throughout the trip, for which at least two members (neither of whom died in the crash) applied. The other was typical one-way flight insurance, available only for flights with definite dates, and 68 of the 92 bandsmen chose that policy for the Trinidad flight.

Upon arrival by plane in Trinidad on February 6, the bandsmen boarded the U.S.S. Macon, which then departed for Rio de Janeiro and Buenos Aires, arriving at the latter port on February 20. On February 16, it was decided that a 19-man orchestral group of the band would fly back, on February 25, in a Navy plane from Buenos Aires to Rio de Janeiro to provide music at a reception for President Eisenhower and the President of Brazil. Until the evening before the flight, some of the bandsmen were not aware that they would be on this sidetrip. Several others, who did know of the trip, requested insurance forms from Chief Petty Officer Zetty, but none were handed out. It was on this February 25th flight that the bandsmen met their

1. Since this case was referred, the pleadings filed, and the trial held prior to the Supreme Court's decision in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), we deem it proper to file this report without reference to the opinions in that case. Defendant's belated assertion that the court is without jurisdiction to hear the case is rejected.

2. The suit is brought on behalf of the estates of the eighteen enlisted men killed in the accident. The estate of Lieutenant J. H. Fultz, also fatally injured, is not represented.

deaths in a mid-air collision between the naval aircraft on which they were flying and a Brazilian plane of REAL Airlines. None of these men was covered by flight insurance on that trip.

 Plaintiffs correctly acknowledge that their request for damages, based on the allegedly negligent failure of the Navy to provide insurance forms, presents no legal claim. Under the Federal Tort Claims Act, making the Federal Government responsible in tort, the United States is not liable for injuries sustained by servicemen, while on active duty, due to the negligence of others in the armed forces. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In addition, the Act does not apply to any claim arising in a foreign country. 28 U.S.C. § 2680(k) (1958); United States v. Spelar, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949).

██ Since this is a Congressional reference, however, we are to examine the broader "equitable" facets of plaintiffs' claim. We determine, in that connection, whether the nation owes a "debt" "based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law" (United States v. Realty Company, 163 U.S. 427, 440, 16 S.Ct. 1120, 1125, 41 L.Ed. 215 (1896)). In making that evaluation it is proper to consider, among other things, whether the claim is of a type recoverable against a private individual (Burkhardt v. United States, 84 F.Supp. 553, 113 Ct.Cl. 658, 667–668 (1949)). It is also relevant to take account of the gen-

eral principles governing the particular area of the law bearing on the claim (Estate of Fairbank v. United States, Ct.Cl., Cong. No. 10–56, decided Jan. 24, 1954, slip op., pp. 7, 9–10).

We therefore take as our starting point the Federal Tort Claims Act, which makes the United States liable for " * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant * * *." 28 U.S.C. § 1346(b) (1958). Since this statute embodies the general principles of tort law applicable between private parties, it can suitably provide the general framework for appraising the plaintiffs' "equitable" claim. Because that claim is equitable, not legal, we can put to one side the specific statutory limitations which bar plaintiffs from recovering under the Act; those exclusions have a special purpose unrelated to general tort principles.[3] Disregarding the exceptions, the issues are easily stated in the terms of the Act:

"(1) Was the alleged 'act or omission of * * * [the] employee of the Government * * within the scope of his office or employment'?

"(2) If so, was that act or omission 'negligent or wrongful'?"

Defendant asserts that Chief Petty Officer Zetty undertook the distribution of flight insurance forms in a purely personal capacity, rather than as part of his Navy duties.[4] The Trial Commissioner

3. The Tort Claims Act contains various exceptions and exclusions but, aside from the two aspects already mentioned, we do not find that plaintiffs' cause of action would be barred by any of these provisions. In particular, it seems plain that the conduct here involved is not a discretionary function under 28 U.S.C. § 2680(a) (1958). In a case not unlike the present one, the Supreme Court stated, "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to * * * [do

so] and engendered reliance * * *, it was obligated to use due care * * *. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act." Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955). See also American Exchange Bank v. United States, 257 F.2d 938, 940–941 (C.A.7, 1958).

4. To buttress its position, defendant emphasizes findings contained in the report

seemed to voice a similar position at one point in his findings. Report of Commissioner, filed May 28, 1963, finding 16(a) (the drum major acted "on his own initiative and in a purely personal capacity outside of his prescribed duties"). We think, however, that the activities in question were well within the scope of the drum major's employment, as that term of art has been judicially construed.

■ Under 28 U.S.C. § 2671 (1958), " 'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, means acting in line of duty." The courts have not attempted to draw any precise line between the two terms. See United States v. Hainline, 315 F.2d 153 (C.A. 10), cert. denied, 375 U.S. 895, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); O'Connell v. United States, 110 F.Supp. 612, 614 (E.D.Wash., 1953). Both have been frequently applied in litigation involving soldiers travelling under orders in their personal automobiles from one post to another, as well as to comparable situations. E.g., Cooner v. United States, 276 F.2d 220 (C.A. 4, 1960), summarizing prior case law in the area. For our purposes, we need point out only that the strictest view requires that the allegedly negligent serviceman be carrying out an authorized act rather than a

detour or frolic, e. g., Witt v. United States, 319 F.2d 704, 709 (C.A. 9, 1963), and also that the act be part of his normal, regular, everyday duties over which his superiors may exercise control. Chapin v. United States, 258 F.2d 465, 468–470 (C.A. 9, 1958), cert. denied, 359 U.S. 924, 79 S.Ct. 607, 3 L.Ed.2d 627 (1959); Cooner v. United States, supra, 276 F.2d at 238–240 (dissenting opinion).[5]

Even under this stricter construction, Zetty's conduct in the present case lay within the scope of his employment. Under that more limited view, the act must first be part of the routine duties of the Government employee.[6] Zetty, who assumed responsibility for the distribution of insurance forms prior to each flight, received no personal gain. As head of the operations department of the band, his duties included assuring that personnel was assigned for each engagement, that the required gear or instruments were provided, and that *all details necessary for a successful engagement were taken care of*. Finding 18(a) (emphasis added). Furthermore, though Zetty was then unaware of the provision, Article C–11112 of the Bureau of Naval Personnel Manual authorizes the commanding officer of any unit having cognizance over Department of Defense

of a special subcommittee (of the House Committee on Armed Services), which was convened to inquire into the circumstances of the fatal accident. See findings 44–54. Although the subcommittee did comment that flight insurance for servicemen was a personal matter, the statement was a broad one dealing with all members of the armed forces; it is not necessarily applicable to the special situation presented here. The subcommittee went on to conclude that relief to the survivors of the bandsmen should not be provided in the form of *general* legislation; it did not, however, take any position regarding the private bills for plaintiffs' relief, one of which has been referred to this court by the House Judiciary Committee.

5. The Tort Claims Act employs the law of the particular place where the act or omission occurred, but in this "equitable" proceeding against the United States

arising out of a foreign accident it is appropriate to look to the principles of tort law accepted generally in this country.

6. In the Chapin case, supra, the court stated that "the act of a soldier's travel on a permanent change of station is not a part of the duties for which he is engaged." 258 F.2d at 469–470. In a prior part of the opinion, it had pointed out that "this situation is entirely unlike those in which the employee's duties require continual travel." Id. at 468. (Footnote omitted.) From these statements, we may infer that the rule the court was applying requires, at most, that the actions involved be part of the regular duties of the serviceman in order to lie within the scope of his employment. See also the dissenting opinion in Cooner, supra, 276 F.2d at 239, 240, to the same effect.

aircraft departures to make flight insurance available to the passengers.[7] The distribution of insurance forms was thus hardly a detour or frolic; rather, it was authorized conduct that constituted a part of Chief Zetty's normal, everyday duties—another administrative detail of the band's activities, to which he, as head of the operations department, attended.

The requirement that the negligent conduct of the Government employee be within the control of his superiors is likewise met. In one common type of case, a serviceman is ordered to travel to a different base by any means of transportation he chooses, and the Government may be thought to have no control over his activities in the intervening period. E.g., Cooner v. United States, supra; Chapin v. United States, supra. Here, the sanctioned activity, that of distributing insurance forms, was considerably more restricted; it did not leave the drum major with a large measure of discretion over an extended period of time. Nor was he beyond the surveillance of his superiors. The evidence indicates that insurance forms were made available to and used by superior officers, and that they knew of the drum major's practice. Finding 18(b). Unlike the conduct of a serviceman travelling by personal automobile from one base to another, Zetty's activities could have been altered at any time by his superiors in precisely the same way they could control his other day-to-day work.[8]

 Having found Chief Zetty's course-of-conduct with respect to insurance forms to be within the scope of his employment, we must ascertain whether the omission in this instance constituted negligence. This case presents another application of the principle that a gratuitous duty, once assumed and relied upon, must be carried out with due care. See Prosser, The Law of Torts 186, esp. n. 80 (2d ed. 1955) (cases involving voluntary assumption of duty to obtain insurance); Harper and James, The Law of Torts (1956), vol. 1, §§ 7.6–7.7, vol. 2, § 18.6, p. 1045; Seavey, Reliance Upon Gratuitous Promises or Other Conduct, 64 Harv.L.Rev. 913, 928 (1951); Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (quoted in n. 3, supra); United States v. Lawter, 219 F.2d 559, 562 (C.A. 5, 1955). Zetty need not have undertaken the acquisition and distribution of flight insurance forms. But for at least eight years prior to the fatal accident he and his predecessors had always distributed the forms, this being one of the duties he assumed as head of the band's operations department. The band members came to rely on this procedure. Particularly was their reliance strong during the tour of a non-English-speaking continent, where the members could not readily obtain the appropriate forms themselves. Their general interest in flight insurance for the air laps of this tour was evidenced before the trip began; in response, the administration of the band supplied the necessary forms for the initial flight to the Caribbean (see findings 28(d), 29, and 30) and obtained additional forms to be used for the return flight from South America scheduled for a major part of the band sometime between March 6 and March 10, 1960 (see finding 41). Simi--

---

7. Plaintiffs contend that this authorization to make flight insurance available was in fact mandatory, and the failure to comply was negligence *per se*. Assuming that this provision has the force of a regulation, we do not construe its apparently permissive terms as mandatory. Cf. Creek Nation v. United States, 318 U.S. 629, 639, 63 S.Ct. 784, 87 L.Ed. 1046 (1943).

8. When the Trial Commissioner found that Zetty undertook the acquisition and distribution of flight insurance forms "on his own initiative and in a purely personal capacity," we think he probably meant that the drum major's activities were "purely personal" in the sense that they were not *specifically required* by regulation or order. The evidence does not support any finding that these activities were for personal gain or were otherwise outside the scope of the drum major's employment. It is clearly not true that only those actions of a serviceman which are required (not simply authorized) by regulation or order are within his scope of employment.

larly, there is no adequate reason to doubt the bandsmen's concern with insurance for the fatal flight, which was not scheduled in advance of the tour but was first arranged toward the middle of February. When the flight became known, some bandsmen specifically requested that insurance applications be supplied (finding 38); others did not know that they would join the 19-man group until the previous evening (finding 35) and therefore had little time to ask for the forms. But the almost universal interest in flight insurance, while the band was in South America, is shown, we think, by the Puerto Belgrano incident mentioned later in this opinion (see finding 40).

The bandsmen's reliance on the customary practice worked to their detriment. If they had been warned prior to their departure from this country that the established procedure was abrogated, they could have taken steps to help themselves, either individually or as an unofficial group. Since the fatal flight was not then scheduled, they could not have bought flight insurance for that trip, but they could have purchased comprehensive insurance or sought trip-insurance forms for possible use in South America. If they had been timely warned after the tour had begun, they still might have been able, by scurrying around, to obtain coverage through local branches of American firms or foreign insurance companies. Or they might have obtained from Chief Zetty the American forms he had in his briefcase. But as a result of their justified dependence on the established practice, none of the 19 men on the flight took out, or could take out, the flight insurance which they would probably have obtained if they had had adequate warning that they would be on their own.

In these circumstances negligence is clear. Chief Zetty omitted the customary procedure, and there is no reasonable exculpation for this lapse. That the drum major possessed the necessary forms prior to the fatal accident, but failed to distribute them, compounds the negligence; because he had planned to use these forms for the pre-scheduled return flight to the United States, their presence slipped his mind. Finding 41.

█ In sum, we have all the elements of a recognized tort: (a) a course of conduct undertaken by a band representative acting within the scope of his employment, (b) reasonable reliance by the bandsmen on this practice, (c) a negligent omission by the Navy representative to fulfill the responsibility he had shouldered, and (d) injury to the dead band members and their families because of this negligent omission. Under the principles applicable between private persons —and generally incorporated into the Federal Tort Claims Act—plaintiffs are equitably entitled to be paid the amount of the flight insurance their decedents would probably have purchased but for the Navy's negligence.[9]

It is no answer that other servicemen, perhaps in combat areas, are not similarly compensated as a result of air accidents. Recovery here would not be reparation for the accident itself, nor would it be a gratuity to this limited group because it had to fly. Recovery would be allowed simply because of the wrongful deprivation of the bandsmen's opportunity to protect themselves by commercial flight insurance. Other servicemen have presumably not been led, by a long course of conduct, to rely on the Defense Department for help in obtaining commercial flight insurance. The members of the Navy Band were so led, and this reliance resulted in a loss peculiar to them. For similar reasons recovery should not be barred by the general provisions Congress makes for the fami-

9. Plaintiffs also contend that the Navy negligently failed to apprise the deceased band members of the South American itinerary and the means of transportation to be used on the tour. Though we need not reach this issue, it should be noted that, by the terms of their enlistment contracts, plaintiffs' decedents were required to serve at any duty station and in any manner required. Findings 6 and 7.

lies and heirs of deceased servicemen (see findings 47–49). Those benefits do not cover the extra financial loss incurred because these bandsmen, properly counting on the usual procedure, failed to obtain commercial flight insurance which would have been additional to the monies otherwise coming to their survivors. Because of this rightful reliance on the Navy, the men's families now have less in assets than they would have had if the band's administrators had acted with due care.

■ In assessing damages, plaintiffs assert that each estate or representative is entitled to recover $50,000, as the alleged amount of insurance that the deceased bandsmen customarily purchased; the Government contends that, if recovery is to be had, it should be limited to $20,000. We think that plaintiffs' figure is not adequately supported by the record. Apparently no list was kept of past insurance purchases by the bandsmen. The Trial Commissioner has found, however, that only 68 of the 92 band members purchased one-way flight insurance from Washington to Trinidad, and that the majority of those acquiring insurance obtained coverage of *either* $25,000 or the maximum $50,000. Five of the deceased band members purchased no insurance for this flight. To award $50,-000 would be to select the maximum although there is inadequate proof that the band as a whole, or the particular bandsmen involved, would have purchased the maximum.

We think that each plaintiff is entitled to recover $25,000. Although immediately after the fatal flight the surviving bandsmen purchased $20,000 rather than $25,000 policies, this choice was apparently influenced, at least in part, by Rear Admiral Stephan, who wired to Washington for the insurance. Finding 43. Moreover, the insurance forms which Chief Petty Officer Zetty had with him at the time of the fatal flight provided coverage up to $50,000, at $1 per *$25,000*. Findings 29(d) and 41. The same type of form was used by fourteen of the nineteen deceased bandsmen in insuring

themselves for the flight to Trinidad, and, as we have noted, the evidence indicates that a majority of the 68 band members who purchased these policies obtained either $25,000 or $50,000 coverage. Finding 30(a). Since we have no means of discriminating among the plaintiffs' decedents, and we reject the maximum for all, it is fair to choose the next lower level, $25,000, as the proper award.

As for the five bandsmen who did not acquire insurance on the flight to Trinidad, we find sufficient reasons for allowing their beneficiaries to recover in this equitable proceeding. See finding 30. Bergey seems to have mistakenly assumed that he was covered by the double indemnity provision of a policy carried by his parents. D'Amico had taken out a $25,000 MATS flight policy, which was invalid on a Department of Defense aircraft flight. The widows of Tramontana and Wilklow joined with the widows of eleven other band members in signing a letter to the House Committee on Armed Services, stating that their husbands had always purchased flight insurance policies in the past ("usually $20,000, sometimes more"), and that they would have done so prior to the fatal flight had they been able. Above all, an event which occurred one day prior to the fatal accident persuades us that all the band members would probably have obtained insurance for the latter flight. On February 24, the band was to fly on an Argentine aircraft from Buenos Aires to Puerto Belgrano. "[M]ost of the members of the band formed an opinion, based upon visual examination of the aircraft, that the aircraft was not safe, and they voiced their concern about the danger involved." Finding 40. The trip was finally canceled for the officially stated reason that weather conditions would not permit a return in time for the February 25th flight. Whatever reluctance to purchase insurance the five band members may have previously had was surely dispelled by this unnerving experience. Consequently, we are not precluded from finding that relief should be afforded to these five bandsmen, under our broad equitable jurisdiction, as well as to the others.

For these reasons, we think that the estate or representative of each of the 18 deceased bandsmen, on behalf of whom this suit is brought, is entitled to equitable relief in the amount of $25,000.

This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to House Resolution 585, 86th Congress, 2d Session.