NARRAGANSETT TRIBE OF INDIANS

v.

SOUTHERN RHODE ISLAND LAND
DEVELOPMENT CORP. et al.

NARRAGANSETT TRIBE OF INDIANS

v.

Dennis J. MURPHY.

Civ. A. Nos. 750006, 750005.

United States District Court,
D. Rhode Island.

Opinion Filed June 23, 1976.

Second Memorandum and Order
July 16, 1976.

Charles G. Edwards, Providence, R. I., Barry A. Margolin, Boston, Mass., for plaintiff.

Frank L. Hinckley, Jr., Narragansett, R. I., John P. Toscano, Jr., Westerly, R. I., Archibald B. Kenyon, Jr., Wakefield, R. I., Harold P. Soloveitzik, Westerly, R. I., Joan M. Montalbano, N. Providence, R. I., Francis Castrovillari, Cranston, R. I., David W. Dumas, Providence, R. I., Charles Nardone, Vincent Naccarato, Westerly, R. I., Allen P. Rubine, Asst. Atty. Gen., James A. Jackson, Providence, R. I., for Southern R. I. Land Development Corp. et al.

Allen P. Rubine, Asst. Atty. Gen., Providence, R. I., for Dennis Murphy.

## OPINION

PETTINE, Chief Judge.

Plaintiff in these consolidated actions has filed a motion to strike certain defenses raised by all or some of the defendants as insufficient as a matter of law, pursuant to Rule 12(f), Fed.R.Civ.P. Both the standards for determining this motion and the sufficiency of the challenged defenses are at issue and have been fully briefed.

### I

It is not enough merely to echo the oft-repeated statement that courts should treat motions to strike with disfavor and be slow to grant them. *See* 5 Wright & Miller, Federal Practice and Procedure: Civil § 1380 at 783; 2A Moore, Federal Practice paragraph 12.21. We must also examine that concept's underlying rationale. This was carefully explored in *Louisiana Sulphur Carriers, Inc. v. Gulf Resources and Chemical Corp.,* 53 F.R.D. 458, 460 (D.Del.1971):

> "Motions to strike a defense as legally insufficient are not favored and will not ordinarily be granted unless the insufficiency is 'clearly apparent', 1A Barron and Holtzoff, Federal Practice and Procedure, § 368, p. 5016 (1960). Not favored because of their dilatory character and tendency to create piecemeal litigation, motions to strike are often denied even when technically correct and well-founded. Wright and Miller, Federal Practice and Procedure, § 1381 pp. 799–800 (1969); 2A Moore Federal Practice, paragraph 12.21[2]. Thus, absent a showing of prejudice, courts are often reluctant to decide disputed and substantial questions of law. *Id.* However, defenses which would tend to significantly complicate the litigation are particularly vulnerable to a motion to strike. *Id.* The Court is of the opinion that the fourth defense would substantially complicate the discovery proceedings and the issues at trial and that the defense is legally insufficient under any facts alleged herein. It, therefore, grants [plaintiff's] Motion to Strike."

While the traditional "disfavor" of a motion to strike stems from its potential for abuse as a dilatory tactic, this drawback must be balanced against the motion's intended use as "the primary procedure for objecting to an insufficient defense," 5 Wright & Miller, *supra* at 782. Weeding out legally insufficient defenses at an early stage of a complicated law suit may be extremely valuable to all concerned "in order to avoid the needless expenditures of time and money," in litigating issues which can be foreseen to have no bearing on the outcome. *Purex Corp., Ltd. v. General Foods Corp.,* 318 F.Supp. 322, 323 (C.D.Cal. 1970).

Whether it will ultimately be more time-consuming to test their sufficiency at the pre-trial stage or during the course of trial is naturally governed by the particular circumstances of each case. In a complicated

case such as the one at bar, retention of the challenged defenses until trial will inevitably require the parties, who approach 40 in number, to engage in extensive discovery which would in large part be obviated if plaintiff prevails on its motion. In addition, the potential presentation of extraneous issues to a jury at the trial of this case would only result in confusion and unduly lengthened proceedings, since the issues remaining in the case would themselves pose thorny legal and factual questions for judge and jury. Lastly, it can be anticipated that the proof necessary to establish the challenged defenses of estoppel by sale, laches, and statute of limitations/adverse possession will be damaging to the plaintiff by evoking the jury's sympathy for the defendants. If plaintiff is correct that these defenses are legally insufficient to defeat its claim, it would be extremely prejudicial to permit defendants to prove them at trial. The Court therefore concludes that as to these consolidated cases, it is appropriate to seriously consider plaintiff's motion to strike despite the traditional reluctance to do so.

In passing upon a motion to strike, a court must treat as admitted all material factual allegations underlying the challenged defenses and all reasonable inferences which can be drawn therefrom. *Kohen v. E. S. Crocker Co.,* 260 F.2d 790, 792 (5th Cir. 1958); *M. L. Lee & Co. v. American Cardboard & Packaging Corp.,* 36 F.R.D. 27, 29 (E.D.Pa.1964). Viewed in this light, a defense will be stricken only if it "could not possibly prevent recovery" by plaintiff on its claim. *United States v. Pennsalt Chemicals Corp.,* 262 F.Supp. 101 (E.D.Pa.1967); *M. L. Lee & Co. v. American Cardboard & P. Corp., supra.* This does not mean, however, that the Court must treat other allegations of the answer, which are not challenged, as true. *Kohen v. E. S. Crocker Co., supra.* Furthermore, unless plaintiff's ability to establish the material allegations underlying its claim is presupposed, we would never be able to reach the issue at hand; our inquiry would continually founder upon plaintiff's failure to establish a prima facie case. Thus, to the extent that the chal-

lenged defenses are not factually in conflict with those facts alleged by plaintiff to support its claim for recovery, we must, for purposes of this motion, assume that plaintiff will be able to establish them at trial.

## II

These consolidated cases consist of two actions brought by plaintiff Narragansett Tribe of Indians to establish its right to possession of certain parcels of land which it contends are unlawfully held by the State of Rhode Island (C.A. No. 750005) and a number of private individuals and businesses (C.A. No. 750006). Plaintiff asserts only one ground for its claim of superior title: that each of the defendants traces his title back to an unlawful alienation of tribal land in violation of 25 U.S.C. § 177, popularly known as the Indian Nonintercourse Act ("the Act"). Plaintiff concedes that unless it is able to establish that the Act's terms cover the land in question, it has no right to recovery on any other basis. On the other hand, it contends that if it is able to meet is prima facie burden of establishing the Act's coverage, there are no affirmative defenses which can defeat its claim.

Our first task is to determine the proof necessary for plaintiff to establish a prima facie case. This task has been greatly simplified by the First Circuit's analysis of the Act in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975), *aff'g,* 388 F.Supp. 649 (D.Me. 1975) (hereinafter *Passamaquoddy* ), which was decided after the parties submitted their briefs.

In *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (hereinafter *Oneida* ), the United States Supreme Court held that the Oneida Indian Nation had stated a federal cause of action cognizable under 28 U.S.C. § 1331 in claiming a right to possession of certain lands which it alleged had been ceded to the State of New York "without the consent of the United States and hence ineffective to terminate the Indians' right to possession under," *inter alia,* the Nonin-

tercourse Act. *Id.* at 664–665, 94 S.Ct. at 776. The Act, 25 U.S.C. § 177, provides as follows:

"No purchase, grant, lease of other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase or any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty."

The Act, which has appeared in this form without material change, *see* part III B, *infra,* since its original enactment in 1790, embodies the policy of the United States "to acknowledge and guarantee the Indian tribes' right of occupancy, *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 348, 62 S.Ct. 248, 86 L.Ed. 260 (1941)," *Passamaquoddy, supra,* 528 F.2d at 379, to tribal lands and "to prevent the government's Indian wards from improvidently disposing of their lands and becoming homeless public charges," *United States v. Candelaria,* 271 U.S. 432, 441, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926). *See also Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960); *Passamaquoddy, supra,* 528 F.2d at

377; 388 F.Supp. at 656–657 and cases cited therein.

In order to establish a prima facie case, plaintiff must show that:

1) it is or represents an Indian "tribe" within the meaning of the Act;
2) the parcels of land at issue herein are covered by the Act as tribal land;
3) the United States has never consented to the alienation of the tribal land;
4) the trust relationship between the United States and the tribe, which is established by coverage of the Act, has never been terminated or abandoned.

*See generally Passamaquoddy, supra.*

### III

The challenged defenses fall into two categories. One group (laches, statute of limitations/adverse possession, estoppel by sale, operation of state law, public policy, hereinafter referred to collectively as "Group One") consists of affirmative defenses in the nature of confession and avoidance. The other challenged defenses ("Group Two") each purport to rebut elements of plaintiff's case in chief.

### A

Let us consider the Group One [1] defenses first. Plaintiff's argument as to these defenses is relatively simple. It contends that if it is able to establish the four elements of its case by a preponderance of the evidence, none of these affirmative defenses could prevent recovery. And, conversely, if plaintiff is unable to do so, defendants will prevail for reasons other than proof of the Group Two defenses.

The Court agrees. A legion of prior judicial decisions supports plaintiff's position.

"The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, includ-

---

1. Group One defenses are compiled by plaintiff in its principal memorandum at 9–11, 17, 33, 35, 38, nn. 4–16, 18, 19, 27, 28, 30. The public policy defense, quoted *id.* at 33 n. 27, has not been pressed by the defendants and, as the ensuing discussion establishes, is completely overshadowed by the contrary federal "public policy" requiring vigorous protection of the rights of Indians. *Cf. Passamaquoddy, supra,* 528 F.2d at 380 n. 11.

ing the original 13." *Oneida, supra,* 414 U.S. at 670 and cases cited at 667–674, 94 S.Ct. at 778.

The broad principle dictated by the Supremacy Clause of the United States Constitution and the sovereign immunity of the United States that state statutes cannot supersede federally created rights [2] has been applied with especial vigor to the question of Indian title as a result of the federal government's "unique obligation toward the Indians," *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

■ Thus, neither the State's alleged unilateral attempt to disband the tribe in 1880, nor its assumption of "almost exclusive responsibility for the protection and welfare of the" tribe's members in the face of almost complete disregard by the federal government, *compare Passamaquoddy, supra,* 388 F.Supp. at 652–653, could operate to terminate the trust relationship between the tribe and the federal government which would be established by proof that the Nonintercourse Act applies herein. *Passamaquoddy, supra,* 528 F.2d at 380, *aff'g,* 388 F.Supp. at 663 n. 15, and cases cited therein.

"Neither the constitution of the State nor any act of its legislature, however formal or solemn, whatever rights it may confer on those Indians or withhold from them, can withdraw them from the influence of an act of congress which that body has the constitutional right to pass concerning them. Any other doctrine would make the legislation of the State the supreme law of the land, instead of the Constitution of the United States, and the laws and treaties made in pursuance thereof." *United States v. Holliday,* 70 U.S. (3 Wall.) 407, 419–420, 18 L.Ed. 182 (1865).

*Accord, McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 173 n. 12, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

■ Similarly, neither the defense of laches, nor statute of limitations/adverse possession, nor estoppel by sale can overrule the operation of federal law if plaintiff establishes a violation of the Act.

"No defense of laches or estoppel is available to the defendants here for the Government as trustee for the Indian Tribe, is not subject to those defenses. *Utah Power and Light Co. v. United States,* 243 U.S. 389, 408–409, 37 S.Ct. 387, 61 L.Ed. 791; *Cramer v. United States,* 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622; *United States v. Walker River Irr. Dist., supra,* 104 F.2d [334] at page 339. . . . And in respect to the rights of Indians in an Indian reservation, there is a special reason why the Indians' property may not be lost through adverse possession, laches or delay. This, as pointed out, in *United States v. 7,405.3 Acres of Land,* 4 Cir., 97 F.2d 417, 422, arises out of the provisions of Title 25 U.S.C.A. § 177, R.S. § 2116, which forbids the acquisition of Indian lands or of any title or claim thereto except by treaty or convention." *United States v. Ahtanum Irrigation District,* 236 F.2d 321, 334 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (footnote omitted).

In *Ewert v. Bluejacket,* 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858 (1922), the Supreme Court considered restrictions upon aliena-

---

**2.** Expressions of this principle abound in decisions of the United States Supreme Court. For example, in *Hughes v. Washington,* 389 U.S. 290, 292–293, 88 S.Ct. 438, 440, 19 L.Ed.2d 530 (1967), the Court stated:

"[A] dispute over title to lands owned by the Federal Government is governed by federal law, although of course the Federal Government may, if it desires, choose to select a state rule as the federal rule."

And in *Board of Commissioners v. United States,* 308 U.S. 343, 350–351, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939), Justice Frankfurter wrote for the Court:

"Nothing that the state can do will be allowed to destroy the federal right which is to be vindicated . . . [S]tate notions of laches and state statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise [citations omitted]. This is so because the immunity of the sovereign from these defenses is historic. Unless expressly waived, it is implied in all federal enactments."

tion of land held by individual Indians. Like the Nonintercourse Act, the restriction there at issue was designed to protect the Indian "wards of the nation" from improvident disposition of their lands, and, in addition, to prevent federal officials involved in Indian affairs from abusing their official position. *Id.* at 136, 42 S.Ct. 442. Upon a finding that the land in question had been conveyed in violation of the federal statute, the Court concluded that the transfer was void and that neither the state statute of limitations nor the doctrine of laches constituted a valid defense.

■ As *Ewert* illustrates, the right to assert the sovereign interests which supersede conflicting principles of state law and equity is not limited to suits brought by the United States as trustee, as defendants contend. Where an action involving Indian land can be maintained by the protected Indians or Indian tribes as well as by the United States on their behalf, it is settled law that the right to assert the sovereign interests at issue here is equally available to either plaintiff.[3] *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968); *Capitan Grande Band of Mission Indians v. Helix Irrigation District,* 514 F.2d 465, 470–471 (9th Cir. 1975) and cases cited therein. *See also United States v. Schwarz,* 460 F.2d 1365 (7th Cir. 1972); *Choctaw and Chickasaw Nations v. Seitz,* 193 F.2d 456 (10th Cir. 1951), *cert. denied,* 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332; *United States v. 7,405.3 Acres of Land,* 97 F.2d 417 (4th Cir. 1938); *Walker River Paiute Tribe v. Southern Pacific Transportation Co.,* Civil No. R–2707 BRT (D.Nev. 5/28/74), *app. pndg. Cf. Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 474 n. 13, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

**3.** This conclusion rests of course on the assumption *arguendo* that plaintiff herein has standing to raise a violation of the Nonintercourse Act on its own. It should be noted that defendants have raised the question of standing in the context of the asserted indispensability of the United States as a separate defense to these actions. Plaintiff concedes that this latter defense is not subject to a motion to strike as insufficient, but correctly contends that the Group One defenses would not affect its right to recovery, whether it prevails on that issue or not.

Thus in reaching the decision herein to grant plaintiff's motion to strike the Group One defenses, the Court has not addressed and does not need to reach the merits of plaintiff's assertion that it has standing to litigate an asserted violation of the Act in the absence of the United States as coplaintiff. It should be noted that these questions are the subject of a separate motion by the defendants to add the United States as a party plaintiff. Beyond this, I would note the language of the First Circuit in *Passamaquoddy, supra,* which suggests that the Supreme Court's decision in *Oneida Indian Nation, supra,* did not implicitly resolve the issue in plaintiff's favor:

"And without United States participation, the Tribe may find it difficult or impossible ever to secure a judicial determination of the claims." *Passamaquoddy, supra,* 528 F.2d at 376.

However, since the First Circuit rendered its decision in *Passamaquoddy,* the Supreme Court has stated with reference to 28 U.S.C. § 1362:

"[I]t would appear that Congress contemplated that a tribe's access to federal court to litigate a matter arising 'under the Constitution, laws, and treaties' would be at least in some respects as broad as that of the United States suing as the tribe's trustee." *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 473, 96 S.Ct. 1634, 1641 (1976).

Although plaintiff herein is admittedly not a "duly recognized" tribe within the meaning of § 1362 and has grounded this action in 28 U.S.C. § 1331 only, it may derive some support for the applicability of the quoted passage to its claim from Judge Friendly's observation in *Oneida Indian Nation v. County of Oneida,* 464 F.2d 916, 919 n. 4 (2d Cir. 1972), *rev'd on other grounds,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974):

"Apart from the use of the same language as in § 1331, the legislative history makes clear that the sole purpose of § 1362 was to remove any requirement of jurisdictional amount. See 1966 U.S.Code Cong. & Admin. News, pp. 3145–3149. The decision, *Yoder v. Assiniboine and Sioux Tribes of Fort Peck Indian Reservation, Mont.,* 339 F.2d 360 (9 Cir. 1964), which the statute aimed to overrule, involved a claim that would have been assertable under § 1331 but for the requirement of jurisdictional amount."

*See also Creek Nation v. United States,* 318 U.S. 629, 640, 63 S.Ct. 784, 87 L.Ed. 1046 (1943); *Choctaw and Chickasaw Nations v. Seitz,* 193 F.2d 456 (10th Cir. 1951), *cert. denied,* 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332.

Indeed the contrary conclusion would inevitably result in the defeat of many Indian land claims when prosecuted by the individual tribe or Indians which would have been vindicated if brought by the United States on their behalf. The undesirability of this anomalous result is manifest once it is recognized that " 'the interests sought to be protected by Congress are the same, no matter who the plaintiff may be' ", *Capitan Grande Band v. Helix Irr. Dist., supra* at 471, and that adequate fulfillment of its trust obligations imposes an "almost staggering burden" on the United States.[4] *Poafpybitty v. Skelly Oil Co., supra,* 390 U.S. at 374, 88 S.Ct. 982, 19 L.Ed.2d 1238. In addition, such a conclusion would disserve "Congress' unique [fiduciary] obligation toward the Indians," *Morton v. Mancari, supra,* 417 U.S. at 555, 94 S.Ct. at 2485; *see Passamaquoddy, supra,* 388 F.Supp. at 660–663, embodied in an extensive statutory scheme which is to "be construed liberally . . . and never to the Indians' prejudice. *Antoine v. Washington,* 420 U.S. 194, 199–200, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975);

*Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930)." *Passamaquoddy, supra,* 528 F.2d at 380.

The cited cases are but a few examples from a long line of decisional law which renders the Group One defenses completely futile: they will not prevent plaintiff from establishing a prima facie case nor in any way defeat its right to recovery if it is able to do so by a preponderance of the evidence. The motion to strike these defenses as insufficient is therefore granted.[5]

B

Since each of the Group Two[6] defenses purports to rebut an element of plaintiff's prima facie case, the legal sufficiency of each must be tested separately.

■ The defendants variously assert that plaintiff has failed to set forth sufficient allegations of its right to possession or acquisition of title to the claimed land. *See* note 6, *supra* at (1). Plaintiff correctly points out that it has set forth allegations sufficient to establish Indian or aboriginal

---

4. A less charitable characterization of the federal government's fulfillment of its responsibilities to its Indian wards appears in *United States v. Ahtanum Irrigation District, supra* at 338:

> "The numerous sanctimonious expressions to be found in the acts of Congress, the statements of public officials, and the opinions of courts respecting 'the generous and protective spirit which the United States properly feels toward its Indian wards', *Oklahoma Tax Comm. v. United States,* 319 U.S. 598, 607, 63 S.Ct. 1284, 1288, 87 L.Ed. 1612, and the ' "high standards for fair dealing" required of the United States in controlling Indian affairs', *United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 47, 67 S.Ct. 167, 170, 91 L.Ed. 29, are but demonstrations of a gross national hypocrisy." (Footnote omitted.)

*See also Creek Nation v. United States,* 318 U.S. 629, 641, 63 S.Ct. 784, 87 L.Ed. 1046 (1943) (Murphy, J., dissenting).

5. Plaintiff correctly notes in its reply memorandum that, although the defense of estoppel as a result of plaintiff's participation in the challenged land sales is no bar to recovery under the Act, *see, e. g., United States v. Ahtanum Irrigation District, supra;* cf. *Passamaquoddy, supra,* 528 F.2d at 370 n. 11; striking this defense does not prevent defendants from raising some or all of the factual allegations under-

lying that claim in order to prove that plaintiff abandoned the subject land, as discussed in *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 357–358, 62 S.Ct. 248, 86 L.Ed. 260 (1941). Plaintiff concedes that abandonment, which has been set forth as a separate defense, would bar its claim and has not therefore included it in this motion to strike.

6. The Group Two defenses are compiled in plaintiff's principal memorandum as follows:

(1) plaintiff has set forth insufficient allegations of acquisition of title to the claimed property, at 5 nn. 1–3;

(2) plaintiff's incorporation under state law removes it from the protection of the Nonintercourse Act, at 22–23 nn. 21–22;

(3) in order to assert a claim under the Nonintercourse Act, plaintiff was required, but failed, to incorporate under the Indian Reorganization Act of 1934, 25 U.S.C. § 477, at 23 nn. 23–24;

(4) plaintiff is excluded from the protection of the Nonintercourse Act because it and its constituent members fall within the terms of a proviso to the Act which excluded "Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the individual states", at 28–29 nn. 25–26.

title to the land.[7] In their brief, defendants do not dispute this contention, but instead argue that "aboriginal title alone does not mean a title having the protection of the Non-Intercourse Act."

 This argument is without merit. Numerous decisions of the Supreme Court establish that aboriginal title or Indian right of occupancy is "entitled to the protection of federal law," *Oneida, supra* at 669, 94 S.Ct. at 778, and, "good against all but the sovereign, [it can] be terminated only by sovereign act." *Id.* at 667, 94 S.Ct. at 777. This doctrine antedated the Nonintercourse Act and was embodied in it. *Id.* at 667–668; *Passamaquoddy, supra,* 528 F.2d at 376 n. 6. Thus the Act was designed precisely to protect aboriginal title. *Passamaquoddy, supra,* 528 F.2d at 377.

The defendants also assert that plaintiff's incorporation under state law constitutes a bar to recovery under the Act. *See* note 6, *supra* at (2), (3). In their brief, defendants elaborate on the bases for these defenses. They argue first that plaintiff has violated rules of good pleading by failing to show a chain of title, *i. e.,* how the claimed right of possession was transferred to the corporation. Second, defendants contend that only a tribe incorporated pursuant to federal

law, 25 U.S.C. § 477, would be able to raise a claimed violation of the Act, whose coverage, it is asserted, extends only to tribes which have been formally and specifically recognized by the federal government.

 These defenses are clearly insufficient. By arguing that plaintiff has violated rules of good pleading, defendants attempt to narrow plaintiff's right to recover under the Act to the situation where it can point to an express grant of title once held by the unincorporated tribe, and presumably embodied in writing, which was formally transferred to plaintiff as corporate property upon incorporation. Such formalities are completely at odds with the concepts of Indian title and Indian sovereignty, which the Act was designed to protect. Indian title arises from the ancestral dominion of land and need not be solemnized in any "treaty, statute, or other formal government action." *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260, (1941). That is the case here. Plaintiff asserts that it *is* the Narragansett Tribe of Indians, not a successor to it, and that it has a tribal right of occupancy to the claimed land which has never been legally extinguished. Resolution of these claims is strictly a matter of federal law,[8] *Oneida, supra* at 670–671, and

---

**7.** Plaintiff has alleged that it is "an Indian tribe which has resided in the State of Rhode Island since time immemorial," and that "since time immemorial the plaintiff Tribe has exclusively owned, used, and occupied" the claimed land, until the acts complained of in these actions. These allegations, if established at trial, are sufficient to prove Indian title or "right of occupancy."

"Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact. If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from land wandered over by many tribes), then the Walapais had 'Indian title'.

\* \* \* \* \* \*

Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action. As stated in the *Cramer* [*v. United States,* 261 U.S. 219 [43 S.Ct. 342,

67 L.Ed. 622] (1923)] case, 'The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive.' 261 U.S. at page 229, 43 S.Ct. at page 344, 67 L.Ed. 622.

Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme." *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 345, 347, 62 S.Ct. 248, 251, 252, 86 L.Ed. 260 (1941).

**8.** "Indian tribe" as used in the Act was defined in *United States v. Canderlaria, supra* 271 U.S. at 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023, quoting *Montoya v. United States,* 180 U.S. 261, 266, 21 S.Ct. 358, 45 L.Ed. 521 (1901), as:

"a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory."

*See Passamaquoddy, supra,* 528 F.2d at 377 n.8. In order to satisfy the first element of a prima facie case, *see* part II, *supra,* plaintiff need do no more than establish at trial that it

"the protection [of the Nonintercourse Act] is not affected by reason of the fact that the band has been incorporated under a state charter and attempts to take action thereunder." *United States v. 7,405.3 Acres of Land*, 97 F.2d 417, 422 (4th Cir. 1938).

■■■■■ The defendants' argument that only federally recognized or federally incorporated tribes are protected by the Act must also be rejected as a matter of law under the reasoning of the First Circuit's decision in *Passamaquoddy, supra.* Like plaintiff herein, the Passamaquoddy tribe had never been formally recognized as a tribe by the federal government, although it was "stipulated to be a tribe racially and culturally," *id.*, 528 F.2d at 376–377, by the parties to the lawsuit. Under *Passamaquoddy,* if plaintiff is able to make such a showing here, it, too, would constitute a "tribe" within the meaning of the Nonintercourse Act.

> "There is nothing in the Act to suggest that 'tribe' is to be read to exclude a bona fide tribe not otherwise federally recognized. Nor, as the district court found, is there evidence of congressional intent or legislative history squaring with appellants' interpretation. Rather we find an inclusive reading consonant with the policy and purpose of the Act. That policy has been said to be to protect the Indian tribes' right of occupancy, even when that right is unrecognized by any treaty, . . . and the purpose to prevent the unfair, improvident, or improper disposition of Indian lands . . . .. Since In-

fits this description. As such a tribe, it is wholly within its power to decide what form its government will take. F. Cohen, Federal Indian Law 126 (1940). *See, e. g., McClanahan v. Arizona State Tax Commission, supra*, 411 U.S. at 172–173, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Crowe v. Eastern Band of Cherokee Indians, Inc.*, 506 F.2d 1231, 1234–1235 (4th Cir. 1974) and cases cited therein.

**9.** The basic principle of construction that statutes relating to Indians should never be construed to their prejudice mandates this conclusion. *Cf. Passamaquoddy, supra*, 528 F.2d at 380. Not only is incorporation under § 477 optional, 25 U.S.C. § 478, even as to those

dian lands have, historically, been of great concern to Congress, . . . we have no difficulty in concluding that Congress intended to exercise its power [to legislate as to tribes generally] fully." *Passamaquoddy, supra*, 528 F.2d at 377 (footnote, citations omitted).

Nor can failure to incorporate under 25 U.S.C. § 477 be a defense to plaintiff's right to bring this action in view of the First Circuit's conclusion, quoted above, since, under 25 U.S.C. § 479, incorporation under § 477 is limited to members of federally recognized tribes. As a result, the coverage of § 477 is not coextensive with, and is much narrower than, the coverage of the Nonintercourse Act.[9]

■■■■ Finally, plaintiff seeks to strike the defenses which claim that plaintiff falls within an exception to coverage of the Nonintercourse Act. This exception appeared as a proviso in early reenactments of the Act between 1793 and 1802 and provided that:

> "nothing in this act shall be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the individual states."

Act of March 1, 1793, ch. 19, § 13, 1 Stat. 331; Act of May 19, 1796, ch. 30, § 19, 1 Stat. 474; Act of March 30, 1802, ch. 13, § 19, 2 Stat. 145.

At the time that this proviso was a part of the Act, the terms of the Act applied to land of "any Indian" as well as to that of any "nation or tribe of Indians."[10] The

Indians to whom it is available, but the statutory scheme of which it is a part was first enacted in 1934, long after the latest reenactment of the Nonintercourse Act took place in 1834. In the absence of a "plain and unambiguous" reduction of the coverage of the earlier Act, *cf. Passamaquoddy, supra*, 528 F.2d at 380 n.12, section 477 cannot be construed to narrow and deny the protective reach of the Nonintercourse Act to the plaintiff.

**10.** As enacted in 1793, the coverage of the Act was defined as follows:

> "[N]o purchase or grant of land, or of any title or claim thereto, from *any Indians* or nation or tribe of Indians, within the bounds

proviso was repealed in 1834, Act of June 30, 1834, ch. 161, § 29, 4 Stat. 734, at the same time that transactions by individual Indians were removed completely from the coverage of the Act. *See* note 10, *supra.* Thus the most logical interpretation of the proviso is the one which is also the most consistent with the rules of construction governing statutes relating to Indians, see note 9, *supra* : the proviso was addressed to transactions by individual Indians living in "white" settlements and has no application to land to which a *tribal* right of occupancy is claimed.

It appearing that none of the Group One or Two defenses is sufficient to undermine plaintiff's claim for recovery, the Court hereby grants plaintiff's motion to strike these defenses in full. Plaintiff shall prepare an order accordingly.

## MEMORANDUM AND ORDER

Defendants in these consolidated actions have filed a motion to join the United States of America as an additional party plaintiff pursuant to Rule 19(a), Fed.R. Civ.P.[1] Plaintiff objects on the ground that it is not "feasible" to order joinder of the United States by virtue of its sovereign immunity from suit to which it has not consented. At the Court's request, the parties have briefed the question whether the United States is an "indispensable party" within the meaning of Rule 19(b).[2]

The plaintiff's cause of action and supporting legal theory have been discussed at some length in a separate opinion, *ante, Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* (D.R.I.1976) (hereinafter *Narragansett I* ), so that a brief summary will suffice here. Plaintiff has brought these two actions against the State of Rhode Island (C.A. No. 750005) and various individuals and businesses (C.A. No. 750006) to establish its right to possession of certain land which it claims is presently held by the defendants in violation of 25 U.S.C. § 177, the Indian Nonintercourse Act ("the Act"). Subject-matter jurisdiction is asserted under 28 U.S.C. §§ 1331, 1337.

In order "to prevent the government's Indian wards from improvidently

---

1. Fed.R.Civ.P. 19(a) provides:

 "*(a) Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so

of the United States, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the constitution." Act of March 1, 1793, ch. 19, § 8, 1 Stat. 330 (emphasis added). Essentially identical language appeared in the 1796 and 1802 versions of the Act. Act of May 19, 1796, ch. 30, § 12, 1 Stat. 472; Act of March 30, 1802, ch. 13, § 12, 2 Stat. 143. The italicized portion was deleted when the statute was reenacted in 1834, which is the version of the Act in effect today. Act of June 30, 1834, ch. 161, § 12, 4 Stat. 730.

joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action."

2. Fed.R.Civ.P. 19(b) provides:

 "*(b) Determination by Court Whenever Joinder not Feasible.* If a person as described in subdivision (a) (1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the persons's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

disposing of their lands and becoming homeless public charges," *United States v. Candelaria,* 271 U.S. 432, 441, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926), the Act renders invalid any purported alienation of tribal land covered by its terms unless the consent of the United States has been obtained. *Narragansett I, ante* at 798. Proof of coverage by the Act also establishes the existence of a fiduciary relationship between the federal government as guardian and the covered Indian tribe as ward. *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 380 (1st Cir. 1975), *aff'g,* 388 F.Supp. 649, 663 n.15 (D.Me.1975) (hereinafter *Passamaquoddy*).

It is beyond debate that the United States, if it chose to do so, could bring an action under the Act as trustee for the tribe. *See, e. g., Choctaw and Chickasaw Nations v. Seitz,* 193 F.2d 456, 460 (10th Cir. 1951), *cert. denied,* 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (hereinafter *Seitz*). It is similarly not disputed that joinder of the United States as a "necessary" party under R. 19(a) would be appropriate if feasible. *Cf. United States v. Hellard,* 322 U.S. 363, 368, 64 S.Ct. 985, 88 L.Ed. 1326 (1944). As the defendants contend, the consequence of failure to join the United States falls squarely within subdivisions (1) and (2)(ii) of R. 19(a). *See* note 1, *supra.* Unless the United States is a party to these actions, a judgment for the defendants would not be binding upon it. *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 371, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968), *quoting Seitz, supra,* at 459; *United States v. Candelaria, supra.* Thus a judgment for defendants in these actions as presently constituted would not completely remove the cloud cast upon their title to the land in question, nor would it preclude the institution of successive law suits on the tribe's claim, first by the tribe herein and second by the United States as the tribe's guardian. A judgment for plaintiff, of course, would accord it full relief in these actions despite the absence of the United States.

Up to this point, the plaintiff does not dispute the foregoing legal analysis, although it contends that, "[a]s a practical matter, . . . there is no real possibility that the [federal] government would attempt to relitigate these issues" if defendants prevail herein. (Pl. Memo. at 7.)

The parties diverge as to the next step to be taken: defendants argue that the Court should enter an order requiring the joinder of the United States as a party; plaintiff contends that, the Court being without power to compel joinder of the United States, it should not enter an order purporting to do so, but should instead proceed directly to determine whether, under R. 19(b), the action may continue in the absence of the United States. The Court concurs in the latter analysis. *Compare Imperial Appliance Corp. v. Hamilton Manufacturing Co.,* 263 F.Supp. 1015 (E.D.Wis. 1967). *See generally* 7 Wright & Miller, Federal Practice & Procedure: Civil § 1604. Rule 19 traces its source to former equity practice, 7 Wright & Miller, *supra,* § 1601, and "it has been a settled maxim of equity jurisprudence that a court of equity will not issue an unenforceable decree of injunction, mandatory or prohibitory." *Hearne v. Smylie,* 225 F.Supp. 645, 655 (D.Idaho 1964), *rev'd per curiam,* 378 U.S. 563, 84 S.Ct. 1917, 12 L.Ed.2d 1036 (1964). *See* Note, Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1012–1013 (1965). *Cf. Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956). Since it does not appear that the United States has expressly or implicitly consented to be sued under the Act, *compare United States v. Hellard, supra,* the federal government's sovereign immunity remains intact and leaves no doubt that the Court is "without jurisdiction to join the United States." *State of California v. Rank,* 293 F.2d 340, 348 (9th Cir. 1961), *aff'd on this ground, rev'd on other grounds sub nom. Dugan v. Rank,* 372 U.S. 609, 617–618, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). It would be a pointless and unseemly gesture for the Court to order joinder of the United States under these circumstances. On the other hand, the Court understands all parties to this litigation to welcome the voluntary inter-

vention of the United States, and it therefore extends a standing invitation to the United States to do so.

We must consequently turn to R. 19(b) "to determine whether in equity and good conscience the action should proceed among the parties before [the Court], or should be dismissed, the [United States] being thus regarded as indispensable." Rule 19(b) enumerates four nonexclusive factors for a court to consider. *See* note 2, *supra.* The first factor concerns the prejudice which nonjoinder will cause the absent person and/or those already parties to suffer.[3] In this case, the absent United States will not be prejudiced by completion of these proceedings on the merits because it will not be bound by any judgment reached herein. *Seitz, supra* at 458. For this reason, as stated above, the defendants fear exposure to multiple litigation in the event they prevail in the instant actions. With reference to the second and third factors listed in R. 19(b), they contend that it is beyond the power of the Court to minimize or avoid the prospect of a second law suit against them by the United States, and that, as a result, a judgment for the defendants which does not bind the United States will not be adequate since it will not dispel the cloud which was cast upon their title to the land by the institution of these proceedings.

▬ In response to the first and second factors, the plaintiff asserts that defendants' exposure to a second law suit, although conceivable in theory, is virtually inconceivable in reality. This is a pertinent contention which has not been challenged. "In applying Rule 19 the courts must refrain from taking a view either too broad or too narrow in determining 'prejudicial' effect of a judgment. The watchwords of Rule 19 are 'pragmatism' and 'practicality.'" *Schutten v. Shell Oil Co.,* 421 F.2d 869, 874 (5th Cir. 1970).

*See also Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 114–115, 119–120 n.16, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *Soar v. National Football League Players' Association,* 65 F.R.D. 531, 538 (D.R.I.1975). As to the third and fourth factors, plaintiff quite logically points out that while dismissal of these suits will do nothing to remove the cloud already cast upon defendants' title, it will effectively prevent plaintiff from ever bringing its case without the voluntary assistance of the United States, which, as correspondence submitted by defendants indicates, is not forthcoming. *See* note 4, *infra.*

▬ Addressing this precise issue in *Seitz, supra* at 460–461, the Tenth Circuit ruled:

"More than twenty years have elapsed and the United States has failed to bring an action, in behalf of the Nations, to establish the Nations' title to, and recover for them the possession and use of, the lands involved in this action. When the trial court undertook to compel the United States to be joined as a party, it asserted that it could not be sued without its consent, and it failed to come into the action voluntarily as a party plaintiff. If we hold that the United States is an indispensable party, the Nations will be unable to prosecute a suit to establish their title to, and recover the possession and use of, their lands predicated upon an alleged cause of action which arose more than twenty years ago. On the other hand, if they are permitted to prosecute the suit, in the absence of the United States, a judgment in favor of the defendants will not bind the United States. Defendants assert that that will result in a continuing cloud upon their titles. But, that is their present situation. So long as the United States fails to commence and prosecute to final judgment, an action to establish the title of the Nations to such

---

**3.** It may be that a court should accord greater weight to the question of prejudice to the absent person than to those already parties. *See* 7 Wright & Miller, *supra,* § 1604 at 42. Rule 19(a)(2), which sets forth a less stringent test

than R. 19(b), *id.* at 41, speaks of a "substantial" risk of prejudice to parties before the court as compared to only the practical possibility of prejudice to absentees.

lands and to recover possession thereof for the Nations, the title of the defendants will continue to be clouded by the possibility of the United States thereafter bringing such an action. So it comes down to this: If we hold that the United States is an indispensable party, the Nations will be unable to assert their long-standing claim to the land; and if we hold that the United States is not an indispensable party, the defendants will run the risk of the burden and expense of defending two lawsuits, even though they succeed in obtaining a judgment in their favor in the instant action.

We are of the opinion that the equities presented by the situation and the inconveniences that will result . . . weigh heavily in favor of the Nations.

We conclude that a final decree determining the title and right to possession as between the Nations and the defendants would not leave the controversy in a situation inconsistent with equity and good conscience."

I find the Tenth Circuit's analysis in *Seitz, supra,* indistinguishable from the matter at bar.[4] In reviewing a long line of Supreme Court decisions "recognizing the right of restricted Indians, Indian tribes and pueblos to maintain an action with respect to their lands," *id.* at 459–460, the court in *Seitz* concluded that those cases stood for the proposition that protected Indians and Indian tribes not only have the capacity to maintain legal action to vindicate an asserted claim to land, but may do so in the absence of the United States as a party. This interpretation was subsequently expressly adopted by the United States Supreme Court in *Poafpybitty v. Skelly Oil Co., supra,* as to Indian rights under the land allotment system and is implicit in the Court's decision in *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), as to Indian tribal rights under the Nonintercourse Act. *See Narragansett I, ante* at 805 n.3. Since the land allotment system and the Nonintercourse Act both embody and fulfill the same federal obligation to protect Indian land, *compare Poafpybitty, supra,* 390 U.S. at 369, 88 S.Ct. 982, *with Oneida, supra,* 414 U.S. at 667–668, 94 S.Ct. 772, *and Passamaquoddy, supra,* 528 F.2d at 376 n.6; it is most consistent with general rules of construction and the specific rules of construction governing statutes relating to Indians, *see Narragansett I, ante* at 808 and n.9, to apply the *Seitz* analysis herein. *See also Fort Mojave Tribe v. Lafollette,* 478 F.2d 1016 (9th Cir. 1973). Indeed, given the likely consequence that a finding of indispensa-

---

4. Defendants' contention that *Seitz, supra, Poafpybitty, supra,* and their predecessors are distinguishable because the protected status of the plaintiff was not at issue therein goes beyond the narrow focus of our present inquiry. For present purposes, we must assume that plaintiff will be able to establish coverage by the Act. The question then is: can plaintiff bring these actions without the presence of the United States? From this perspective, the cited decisions are quite relevant. Of course, our affirmative answer to this question does not in any way foreclose a judgment for the defendants on the merits in the event plaintiff fails to carry its burden to show that it and the land in question are covered by the Act.

The defendants' argument that resolution of the plaintiff's tribal status under the Act necessitates an affirmative decision by Congress or the United States Department of the Interior has been rejected in this Circuit. *Passamaguoddy, supra,* 528 F.2d at 377; *Narragansett I, supra.* Furthermore, defendants' fear that the plaintiff's tribal status will be adjudicated with-

out the benefit of the United States viewpoint is unfounded. The federal government's position vis-à-vis the plaintiff and its claim can be discerned and made a part of these proceedings, to the extent relevant, even though it is not a party.

Lastly, defendants' suggestion that plaintiff follow the example of the Passamaquoddy tribe in litigating its claim, *see Passamaquoddy, supra,* is completely unpersuasive. A finding, after many years of litigation, that the Passamaquoddy tribe is a "tribe" within the meaning of the Act has not affected that tribe's inability to compel the United States to institute proceedings on its behalf, nor has it in any way dissipated or even reduced the size of the cloud hanging over the title to land which it claims under the Act. As specifically noted by the First Circuit in its decision, the Court did not reach the question, "by implication or otherwise, whether the Act affords relief from, or even extends to, the Tribe's land transactions" which underlay the suit. *Passamaquoddy, supra,* 528 F.2d at 376.

bility herein would effectively deny plaintiff any remedy, *see Capitan Grande Band of Mission Indians v. Helix Irrigation District*, 514 F.2d 465, 470 (9th Cir. 1975), whether our analysis focuses on the unique protection to be accorded Indian wards, as discussed above, or on the balancing test more generally made under R. 19(b),[5] it compels the conclusion that the United States is not an indispensable party to this action, which the plaintiff may maintain on its own behalf.

The defendants' motion to join the United States as a party under Rule 19(a) or to dismiss the actions under Rule 19(b) for failure to join an indispensable party is denied. The Clerk of Court shall serve a copy of the within memorandum and order upon the United States so that it may be advised of the pendency of these actions and the invitation for it to intervene. *Cf. Imperial Appliance Corp. v. Hamilton Mfg. Co., supra* at 1018–1019.

5. The equitable balance does not shift significantly even if one disregards the special status of Indian wards. In general, "the philosophy of present Rule 19 is to avoid dismissal wherever possible." *Heath v. Aspen Skiing Corp.*, 325 F.Supp. 223, 229 (D.Colo.1971). More specifically, when the absent person is the United States, "when relief can be granted to a party without affecting the United States, the government usually will not be held to be indispensable to the action." 7 Wright & Miller, *supra*, § 1617 at 171 (footnote omitted).

Lastly, the Court notes two decisions, involving neither Indians nor the United States, in which Rule 19(b) considerations similar to those at bar did not result in dismissal. In *Bennie v. Pastor*, 393 F.2d 1 (10th Cir. 1968), the court recognized the potential exposure of the defendant to inconsistent judgments if the absent person was not joined, which, if the suit proceeded, could only be prevented by binding the absentee and denying her a day in court. Dismissal, on the other hand, would bar plaintiff from any remedy because the whereabouts of the absent person were unknown. The court took the position that these R. 19(b) considerations were evenly balanced and looked to state law and other considerations to conclude that the suit should not be dismissed under R. 19(b). In analyzing this decision, Wright & Miller suggest that underlying the court's reference, 393 F.2d at 5, to "pragmatic considerations" was the realization that the likelihood of suit by the defendant against the absentee, the defendant's daughter, was remote, and that both were covered by the same liability insurance policy,

## MEMORANDUM AND ORDER

Defendants Providence Boys Club, *et al.* have filed their motion to dismiss these consolidated cases for lack of subject-matter jurisdiction on the ground that determination of the tribal status of plaintiff comprehends a nonjusticiable "political question".[1]

In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court undertook its most exhaustive analysis and, perhaps, reconciliation of its previous discussions of the political question doctrine. At the outset the Court noted that such a claim of nonjusticiability does not in itself undermine the court's subject-matter jurisdiction but rather calls for a judgment for defendants on the merits on the ground that plaintiff has failed to state a claim for which relief may be granted. *Id.* at 198–200, 82 S.Ct. 691. *See also Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). As in *Baker v. Carr, supra*, it is clear that

*Bennie v. Pastor, supra* at 5 n.12, thus minimizing the potential exposure of the defendant to inconsistent results. 7 Wright & Miller, *supra*, § 1604 at 42.

In *Imperial Appliance Corp. v. Hamilton Mfg. Co., supra*, the court found that the absent persons, as here, would neither be bound nor prejudiced by the action, but that they should be joined under R. 19(a)(2)(ii) in order to prevent defendant's exposure to multiple litigation. Joinder was not feasible however. Since neither plaintiffs nor the absentees would be prejudiced by continuation of the suit without them, and there was no alternative forum in which plaintiffs could maintain the action against all interested parties, the court concluded that the balance tipped toward the plaintiffs and refused to dismiss the action under R. 19(b), stating:

"Where the determination rested on balancing the loss of plaintiff's right to litigate its claim against a defendant's possible exposure to further suit, the courts have deemed it just and equitable to allow the action to continue in the absence of parties having a material interest therein." *Id.* at 1018 (citations omitted).

*See also Soar v. National Football League Players' Association, supra* at 538 and nn. 12, 13, and cases cited therein.

1. For a recent discussion questioning the existence of the "doctrine", *see* Henkin, "Is There a 'Political Question' Doctrine," 85 Yale L.J. 597 (1976).

plaintiff herein has stated a cause of action which "arises under" a federal statute, and, as a result, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). Plaintiff's assertion that the matter in controversy meets the jurisdictional minimum of $10,000. has not been seriously questioned. *See Murray v. Vaughn*, 300 F.Supp. 688 (D.R.I.1969).

In *Baker, supra*, 369 U.S. at 215, 82 S.Ct. 691, the Court, while acknowledging its "deference to the political departments in determining whether Indians are recognized as a tribe", noted that "here too, there is no blanket rule".[2]

> "While 'It is for [Congress] * * *, and not for the courts, to determine when the true interests of the Indian require his release from [the] condition of tutelage " * * *, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe * * *.' *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 6, 58 L.Ed. 107. Able to discern what is 'distinctly Indian', ibid., the courts will strike down any heedless extension of that label. They will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power." *Id.* at 216, 82 S.Ct. 691, 709–710.

Concluding that "[t]he cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing," *Baker, supra* at 217, 82 S.Ct. at 710, the Court identified the elements which, singly or collectively, describe a nonjusticiable political question:

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.*

A brief review of these elements in relation to the instant proceedings reveals that no political question is present to bar this litigation.

1) *A textually demonstrable constitutional commitment of the issue to a coordinate political department.* Article I, § 8 of the United States Constitution clearly reserves to the sole authority of Congress the power "[t]o regulate commerce . . . with the Indian tribes." *See also National Indian Youth Council v. Bruce*, 485 F.2d 97, 99 (10th Cir. 1973), *cert. denied*, 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226, recognizing "the plenary power of Congress to control and manage the affairs of its Indian wards." But even in this area, as recalled in the passage quoted from *Baker v. Carr, supra*, 369 U.S. at 216, 82 S.Ct. 691, there are judicially reviewable limits to Congress' exercise of these powers. More pertinently, as the First Circuit held in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1975) (hereinafter *Passamaquoddy*), Congress has in fact exercised its plenary power in enacting 25 U.S.C. § 177, the Nonintercourse Act, and has done so in a manner which applies to Indian tribes generally. *Id.* at 377. While a hypothetical plaintiff's complaint that it *should have been* included among a group

---

**2.** "Much confusion results from the capacity of the 'political question' label to obscure the need

for case-by-case inquiry." *Id.* at 210–211, 82 S.Ct. 691, 706.

of tribes specified in some Congressional enactment would likely raise a political question, in seeking judicial inquiry into the wisdom of Congress' decision, *cf. Passamaquoddy, supra* at 377, plaintiff Narragansett Tribe of Indians seeks only to enforce a Congressional enactment. Judicial construction and implementation of a statute passed by Congress surely cannot constitute interference with powers committed by the Constitution to Congress. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

 2) *A lack of judicially discoverable and manageable standards for resolving the dispute.* This element is not present. The dispute at issue here is the determination of plaintiff's status as a tribe within the meaning of the Nonintercourse Act. In *Narragansett I*, ante at 807 n.8 this Court noted, as had the First Circuit in *Passamaquoddy, supra* at 377 n.8, that the definition of "Indian tribe" as used in the Nonintercourse Act had been stated by the Supreme Court in 1901 in *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521, to be:

> "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined territory."

Thus, the standards for resolving the dispute are firmly established.

3) *Other elements.*

The remaining elements identified in *Baker, supra*, 369 U.S. at 217, 82 S.Ct. 691, are simply not implicated herein: the initial policy determination *was* made by Congress in enacting a protective statute that would apply to Indian tribes generally; construction and implementation of its terms by the courts evince no disrespect to Congress.

The defendants make much of the distinction that tribal status, disputed here, was stipulated in *Passamaquoddy*. With all respect, the Court cannot discern a material distinction. Although one of the parties to the stipulation in *Passamaquoddy* was the

defendant Secretary of the Department of the Interior, the First Circuit's decision makes clear that the stipulation extended only to the racial and cultural identity of the tribe; despite the stipulation, the Secretary contended the tribe was not covered by the Act. Thus, no affirmative policy decision specifically relating to the Act's application to the Passamaquoddy Tribe has ever been made either by the Secretary or by Congress. Assuming *arguendo* that determination of tribal status under the Act is a nonjusticiable political question, how can a limited concession of tribal status which is obtained from the Secretary only in the course of litigation constitute that type of affirmative policy decision that is necessary to overcome the political question barrier? Certainly a change in the method of proving plaintiff's case, from demonstration by preponderance of the evidence to stipulation, cannot be sufficient to transform a political question into a justiciable issue. Acceptance of such a proposition would place the federal policymaker in the untenable position of disputing what it knows to be susceptible of proof by a preponderance of the evidence simply to prevent its acknowledgment of the truth of those facts from being considered an affirmative decision on its part. *If* there is a policy decision which is to be made solely by that body, the timing of that decision cannot be dictated by the institution of court proceedings without running afoul of any number of the elements of a political question identified in *Baker, supra*, 369 U.S. at 217, 82 S.Ct. 691. Therefore I conclude that the fact that the racial and cultural identity of the plaintiff as a tribe in *Passamaquoddy* was undisputed does not distinguish it from the cases at bar. There, as here, no affirmative decision vis-à-vis the named tribe had ever been made by Congress or the Department of the Interior. The First Circuit concluded that this failure did not prevent the Passamaquoddy Tribe from falling within the terms of the Nonintercourse Act.[3] The same reasoning applies herein.

The motion to dismiss is therefore denied.

---

3. Although the First Circuit did not address the "political question" argument raised here by

name, its rejection of that argument is implicit in its ruling that the protection of the Noninter-

course Act extends to bona fide Indian "tribes" generally, despite a complete absence of federal dealings with the specific tribe at issue. The Court recognized that evidence of past relations between a tribe and the federal government or "judgments of officials in the federal executive branch" as to tribal status might be of great relevance to a judicial determination of the Act's coverage. *Passamaquoddy, supra* at 377. However, neither were present in that case. The Court instead relied upon a stipulation, entered into for purposes of the lawsuit, which established tribal status within the definition of *Montoya v. United States, supra. Id.* at 377 n.8. As defendants themselves asserted at oral argument, that stipulation was not intended to and cannot be considered the equivalent of an official federal judgment that the Passamaquoddy Tribe is and should be covered by the Act. If, as defendants contend, such an official decision is a prerequisite to coverage under the Act, then *Passamaquoddy* was wrongly decided, and the fact of stipulation irrelevant. But this Court is both bound by and in full agreement with the First Circuit's decision in that case.